USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/7/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
LE'RUN NIGHTINGALE,      :
                         :              PRO SE
              Petitioner, :
                         : 05 Civ. 1994 (GBD)(THK)
                         :
    -against-            :
                         : **REPORT AND RECOMMENDATION**
CONWAY,                  :
                         :
              Respondent. :
---------------------------------------X

**TO: HON. GEORGE B. DANIELS, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

Petitioner Le'Run Nightingale brings this action for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his November 14, 2001 conviction in New York Supreme Court, New York County, after a jury trial, of three counts of Robbery in the First Degree (N.Y. Penal Law § 160.15(3)), and one count of Attempted Robbery in the First Degree (N.Y. Penal Law §§ 110.00/160.15(1)). Petitioner was sentenced as a second felony offender to prison terms of 20 years on the robbery counts, and a determinate ten-year sentence on the attempted robbery count, with each term to run concurrently with the others.  In a decision dated November 13, 2003, the Appellate Division, First Department affirmed Petitioner's conviction and, on February 3, 2004, the New York Court of Appeals denied Petitioner's application for leave to appeal.  See People v. Nightingale, 1 A.D.3d 179, 766 N.Y.S.2d 847 (1st Dep't 2003), lv. denied, 1 N.Y. 3d 631 (2004).

Petitioner raises three claims in his Petition: (1) that the lineup in which he was identified was unduly suggestive; (2) that

COPIES MAILED
TO COUNSEL OF RECORD ON 1/7/09

he was deprived of a fair trial because, during his cross-examination, the prosecutor was permitted to inquire into the underlying facts of a prior attempted assault conviction, among others; and (3) that his sentence was excessive and should be reduced in the interests of justice. (See Brief for Defendant-Appellant to the Appellate Division, First Department ("Pet.'s App. Br."), appended to the Petition.)[1]   The Petition was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York.  For the reasons that follow, the Court recommends that the Petition be dismissed with prejudice.

BACKGROUND

I.   The Crime

On December 5, 2000, Petitioner entered a furniture store in Manhattan, expressed interest in a chaise lounge, and then pulled out a large kitchen knife and demanded money from the three women in the store — the store manager, bookkeeper, and cleaning woman. He took money from the store's cashbox, twenty dollars from the bookkeeper, and then ripped a chain from the neck of the cleaning woman and took several rings that she was wearing.  During the robbery of the three women, a customer entered the store; Petitioner took her cellphone and money from her purse.  Petitioner

---

[1] Petitioner relies on his state court appellate brief for the characterization and argument of his claims.

was ultimately identified in a photo array and lineup, and argued

that the lineup was unduly suggestive.  A suppression hearing was

held, pursuant to United States v. Wade, 388 U.S. 218, 87 S. Ct.

1926 (1967), at which the following evidence was adduced.

## II.  Suppression Hearing

The store employees identified the robber as a black man who

was approximately thirty years old, 250 pounds, and 6 feet or 6'4"

tall.     Detective   Michael   Hanratty,   of   the   13th   Precinct

Apprehension Module, compiled 233 photographs, based upon the

description he had been provided of the robber. (See Transcript of

Wade Hearing, dated June 20, 2001 ("W."), at 60-63.)  None of the

employees identified anyone in the photos, or various arrays of the

photos, as being the robber. (See id. at 64.)

After reviewing the telephone records of the cellphone that

had been stolen, Detective Michael Kennedy found one call made to

the Brooklyn office of the Division of Parole, and another call

made to a woman later identified as Petitioner's sister. (See id.

at 10-12.)   The former was made directly to Petitioner's parole

officer, thus leading to Petitioner's identification as a suspect.

Kennedy then created a photo array with Petitioner's and five other

men's pictures and showed it to Caroline Gavin ("Gavin"), one of

the  store  employees  who  had  been  robbed.     When  Gavin  saw

Petitioner's picture she dropped it on the table, began to cry, and

told the detective that Petitioner was the robber. (See id. at 18,

3

41.)  Petitioner was subsequently arrested at his next appointment
with his parole officer. (See id. at 22.)  A lineup was conducted
that day, which Gavin and Dania Peguero ("Peguero"), the store
bookkeeper, were given an opportunity to view.   Detective John
White selected five fillers for the lineup, and Petitioner chose to
be seated in position "five."   (See id. at 28-29.) According to
White's notes, the fillers weighed 200, 198, 180, 170, and 165
pounds, respectively. (See  id.  at  38.)    Petitioner  weighed
approximately 240 pounds.   Detective Kennedy conceded that the
fillers were substantially lighter in weight than Petitioner, but
he went forward with the procedure because he thought it was a good
lineup. (See id. at 38-39.)

     Upon   viewing   the   lineup,   Gavin   immediately   identified
Petitioner  as  the  person  who  robbed  her  at  knife  point.
Separately, Peguero also identified Petitioner as the person who
robbed the store. (See id. at 32-33, 35, 46-47, 48.)

     At the conclusion of the hearing, defense counsel argued that
the lineup was unduly suggestive because Petitioner was between
forty  to  seventy-five  pounds  heavier  than  the  fillers.    In
addition, defense counsel noted that Petitioner had a darker
complexion than all but one of the fillers, and that one filler
weighed only 165 pounds, thus making him an unlikely person to be
selected by the victims. (See  id.  at 80-81.)   Defense counsel
further argued that the memory of one of the witnesses had been

4

tainted by her prior identification of Petitioner in the photo array, in which Petitioner was distinctive in terms of his hair length, lack of a mustache, and the size of his face.   (See id. at 79-80.)

The court denied Petitioner's suppression motion, first concluding that there was nothing about the hair styles, facial features or anything else that was suggestive in the photo arrays. With respect to the lineup, the court found that there was "nothing at all" about Petitioner's "age, height, weight, facial features, clothing, hairstyle [that] suggests that the defendant should be selected." (Id. at 95.)   The court further found that there was nothing in the manner in which the witnesses were asked to view the lineup that was suggestive.   The court concluded that the lineup was "fairly comprised" and "fairly conducted." (Id.)

III. Sandoval Hearing

On October 9, 2001, a hearing was held pursuant to People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849 (1974), to determine whether the prosecution would be permitted to cross-examine Petitioner about his prior convictions.  Petitioner had three prior felony convictions: (1) a 1998 conviction for Criminal Contempt in the First Degree, for threatening his girlfriend in violation of an order of protection; (2) a 1997 conviction for Attempted Assault in the Second Degree, for stabbing a man in the head; and (3) a 1990 conviction for Attempted Robbery in the Second Degree, for robbing

5

and beating a woman. (See Sandoval Hearing Tr. ("Sand.") at 4, 6-8.) Petitioner also had six prior misdemeanor convictions, including: (1) a July 1997 conviction for unlicensed vending; (2) a 2000 conviction for theft of services; (3) a May 1997 conviction for unlicensed vending; (4) a 1996 petit larceny conviction arising from an incident where Petitioner put a gun to the victim's head during a robbery; (5) a 1990 petit larceny conviction; and (6) a 1987 petit larceny conviction arising from an incident where Petitioner robbed and beat a woman. (See id.)

The prosecution sought to cross-examine Petitioner about all of his prior convictions, as well as his lack of employment, the fact that he lived with his sister at the time of the robbery, and his parole status.

After hearing argument, the court precluded the prosecution from inquiring into five of Petitioner's nine convictions, including the convictions for theft of services and unlicensed vending, as well as the 1990 and 1987 convictions for petit larceny. (Id. at 20-22.) However, the hearing court held that Petitioner's conviction for criminal contempt, and his October 1997 conviction for attempted assault, were relevant to Petitioner's credibility. Therefore, the prosecution was allowed to ask Petitioner whether the attempted assault conviction involved Petitioner stabbing his victim, and whether that assault led to the order of protection that Petitioner violated, leading to his

6

criminal contempt conviction. (Id. at 21.)  The prosecution was also permitted to ask Petitioner whether he had been convicted of petit larceny in 1996, and whether he had been convicted of attempted robbery of a female victim in 1990.  If Petitioner denied committing those offenses, the court would allow the prosecution to ask about the underlying facts. (Id. at 21-22.)

The hearing court further ruled that the prosecution could ask whether Petitioner had been employed when the robbery occurred, what his source of income was, and with whom he lived.  If Petitioner's parole officer testified about receiving the telephone call from the stolen cellphone, the prosecution would be permitted to ask about Petitioner's parole status, but not how he was doing on parole.  (Id. at 22-23.)

IV.  The Trial

The following facts were adduced at Petitioner's trial.

A.  The People's Case

At approximately 1:00 p.m. on December 5, 2000, store manager Pauline Yeats, production manager Caroline Gavin, bookkeeper Dania Peguero, and cleaning woman Altagracia Flores, were all at work at the Pauline Yeats Furniture Store in Manhattan.  (See Trial Transcript ("Tr.") at 26-27, 45, 153, 204.)  Petitioner entered the store and inquired about the cost of a chaise lounge that was in the store window.  (See id. at 155-56, 161-64.)  While Gavin was checking the computer for the price of the chair, Petitioner pulled

7

a large kitchen knife from his pocket and repeatedly said that if the women did not give him their money they would get hurt. (See id. at 50, 58, 78, 80, 159-60.) Peguero retrieved the store's petty cash box and opened it. Petitioner took between fifty and eighty-five dollars from the box. (See id. at 51-52, 162-63.) He also took twenty dollars from Peguero's hand and, while holding a knife to Gavin's face, searched her purse for money. He returned the purse after determining that it contained only one dollar. (See id. at 53, 80, 164.) Petitioner then pulled a chain necklace from Flores's neck, and Flores handed over to Petitioner three rings she had removed from her fingers. (See id. at 53-54, 165, 206-07.)

Approximately five to ten minutes after the robbery began, a customer named Charlotte Bonstrom entered the store while talking on her cellphone. After she ended her call, Petitioner held his knife to her throat, removed money from her wallet, and took her cell phone. (See id. at 56-57, 80-81, 114-16, 169, 209.) Bonstrom had a clear view of Petitioner's face and features while he rummaged through her purse. (See id. at 115-17.) Peguero and Gavin watched Petitioner as well. (See id. at 59, 167-70.) In total, Petitioner spent approximately twenty to thirty minutes inside the store. (See id. at 169.)

Shortly after the robbery occurred, Detective Kennedy investigated the calls made on Bonstrom's cellphone. Calls had

8

been made to Petitioner's parole officer, as well as his sister. (See id. at 119-20, 218, 229-30.)  On January 29, 2001, Kennedy arrested Petitioner when he was meeting with his parole officer. (See id. at 233.)  Kennedy then arranged a lineup at which both Gavin and Peguero identified Petitioner. (See id. at 65-66, 171-72.)  In addition, at trial, Gavin, Peguero, and Bonstrom all identified Petitioner as the man who had threatened and robbed them. (See id. at 58, 110-11, 157.)

B.   Petitioner's Case

Petitioner testified that he had never been to the Pauline Yeats Furniture Store, and that on December 5, 2000, he bought a cellphone for ten dollars in midtown Manhattan, from a man who had sold Petitioner various items in the past.  Petitioner did not know his name.  Petitioner testified that he used the cellphone he purchased to call his sister and parole officer. (See id. at 294-95, 296-97.)  According to Petitioner, after he was arrested he was denied permission to see his attorney and was placed in a lineup with "crack heads" who did not resemble him. (See id. at 296-97.)

Petitioner acknowledged that he had "problems with the law" in the past, was on parole, and had used aliases. (See id. at 291-93.) He stated that he had been convicted of attempted second-degree assault in 1997, petit larceny in 1996, attempted second-degree robbery in 1990, and criminal contempt in 1994. (See id. at 293-94.)   On cross-examination, Petitioner admitted that he had

9

forcibly taken property from a woman in 1990, and that he had committed a second-degree attempted assault in 1997. Petitioner further acknowledged that he had disregarded an order of protection issued as a result of the 1997 attempted assault conviction. (See id. at 302, 305-07, 309.)

Police Officer Bart Solomon testified that he examined the furniture in the store for fingerprints and had recovered three prints from the cash box. (See id. at 280.) Detective Frank Vecchio analyzed the prints, determined that only two were identifiable, and that neither of them matched Petitioner's prints. He could not determine when a print was left on a surface, and testified that not everyone who touches a surface leaves a print. (See id. at 287-88.)

C.  Verdict and Sentence

On October 17, 2001, the jury convicted Petitioner of three counts of First Degree Robbery and one count of Attempted First-Degree Robbery. (See id. at 430-32.) On November 14, 2001, Petitioner was sentenced as a second felony offender to concurrent indeterminate terms of twenty years' incarceration for the robberies, and ten years for the attempted robbery.

V.  Direct Appeal

Petitioner's appellate counsel filed an appeal in the Appellate Division, First Department, arguing: (1) the lineup was unduly suggestive because Petitioner was the only man who weighed

10

nearly as much as the assailant described by the witnesses, and
because the fillers were also distinguishable from Petitioner in
terms of skin color and facial hair; (2) the court improperly
permitted the prosecution to inquire into Petitioner's prior
assault conviction, which involved a knife that was similar to the
knife used in the robberies in the instant case; and (3)
Petitioner's sentence was excessive and should be reduced in the
interests in justice. As noted, the Appellate Division affirmed
Petitioner's conviction, holding that (1) "the line-up participants
were sufficiently similar in appearance so that [Petitioner] was
not singled out for identification;" (2) the Sandoval ruling was a
proper exercise of discretion; and (3) there was no basis for
reducing Petitioner's sentence. Nightingale, 1 A.D.3d at 179, 766
N.Y.S.2d at 847.

## DISCUSSION

## I. AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act
("AEDPA"), a federal court may grant habeas relief to a state
prisoner only if a state court conviction "resulted in a decision
that was contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court
of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based
on an unreasonable determination of the facts in light of the
evidence presented in the State court proceeding." 28 U.S.C. §

11

2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000); accord Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir. 2006). The phrase, "clearly established Federal law," limits the law governing a habeas petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523); accord Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard. . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 411, 120 S. Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See

12

Williams, 529 U.S. at 413, 120 S. Ct. at 1523.  The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable."  Id. at 408-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.  The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); Lurie v. Wittner, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

    Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility").  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

II. Suggestiveness of the Lineup

    As he did in his direct appeal, Petitioner contends that the

13

lineup was unduly suggestive because the fillers were significantly thinner than the described and actual weight of Petitioner, two had lighter skin tone than Petitioner, and all of the fillers had facial hair while Petitioner was clean shaven.  (See Pet.'s App. Br. at 14-19.)

A.   Legal Standard

A defendant's right to due process includes the right not to be the object of pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); see also United States v. Eltayib, 88 F.3d 157, 166-167 (2d Cir. 1996); United States v. Thai, 29 F.3d 785, 807 (2d Cir. 1994).  In determining whether a lineup is unduly suggestive, the reviewing court must consider the totality of the circumstances.  See Manson v. Brathwaite, 432 U.S. 98, 113, 97 S. Ct. 2243, 2252 (1977); Eltayib, 88 F.3d at 167; United States v. Concepcion, 983 F.2d 369, 378 (2d Cir. 1992); Morillo v. Crinder, No. 97 Civ. 3194 (SAS), 1997 WL 724656, at *4 (S.D.N.Y. Nov. 18, 1997).  More specifically, an identification procedure may be deemed impermissibly suggestive with respect to a defendant if "he meets the description of the perpetrator given by the witness and the other members of the lineup obviously do not."  Raheem v.  Kelly, 257 F.3d 122, 134 (2d Cir. 2001).  However, "[p]olice stations are not theatrical casting

14

offices; a reasonable effort to harmonize the line-up is normally all that is required." Roldan v. Artuz, 78 F. Supp. 2d. 260, 271 (S.D.N.Y. 2000) (quotation marks omitted); see also Byas v. Keane, No. 97 Civ. 2789 (SAS), 1999 WL 608787, at *14 (S.D.N.Y. Aug. 12, 1999); Morillo, 1997 WL 724656, at *5; Moreno v. Kelly, No. 95 Civ. 1546 (JGK), 1997 WL 109526, at *9 (S.D.N.Y. Mar. 11, 1997). "With regard to physical characteristics, the Second Circuit has only found pre-trial identifications suggestive when the other participants possess characteristics far different from the defendant's critical obvious markings." Blas v. Herbert, No. 02 Civ. 6257 (HB) (DFE), 2003 WL 22480093, at *5 (S.D.N.Y. Oct. 31, 2003). "There is no requirement that . . . in line-ups the accused must be surrounded by persons nearly identical in appearance." United States v. Reid, 517 F.2d 953, 965 n. 15 (2d Cir. 1975).

If the lineup procedure was not impermissibly suggestive, then the identification "presents no due process obstacle to admissibility, [and] no further inquiry by the court is required." Raheem, 257 F.3d at 133 (internal citations omitted).  Even if the lineup was impermissibly suggestive, however, the identification it produced would still be admissible at trial if it was independently reliable.  See Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972).  To determine if an identification was independently reliable, a court must take into account "the opportunity of the

15

witness to view the criminal at the time of the crime, the witness'
degree of attention, the accuracy of his prior description of the
criminal, the level of certainty demonstrated at the confrontation,
and the length of time between the crime and the confrontation."
Manson, 432 U.S. at 154, 97 S. Ct. at 2253 (citing Biggers, 409
U.S. at 199-200, 93 S. Ct. at 382); accord Raheem, 257 F.3d at 135.

Whether a pre-trial identification was suggestive is a mixed
question of law and fact.  See Sumner v. Mata, 455 U.S. 591, 597,
102 S. Ct. 1303, 1306 (1982)(per curiam). "On federal habeas
review, mixed questions of law and fact" are "subject to the
standard set forth in 28 U.S.C. § 2254(d)(1), which requires the
habeas court to determine whether the state court's decision 'was
contrary to, or involved an unreasonable application of, clearly
established Federal law . . . .'" Overton v. Newton, 295 F.3d 270,
277 (2d Cir. 2002)(citing Williams, 529 U.S. at 400, 120 S. Ct. at
1517-18). "However, pure determinations of fact — for example,
whether a person in a lineup was sitting or standing — are entitled
to the statutory presumption of correctness under 28 U.S.C. §
2254(e)(1)," which "may only be rebutted by clear and convincing
evidence." Givens v. Burge, No. 02 Civ. 0842 (JSR)(GWG), 2003 WL
1563775, at *7 (S.D.N.Y. Mar. 4, 2003).  Thus, while "a state
court's finding on the overall constitutionality of challenged
identification testimony is not entitled to the presumption of
correctness," the "findings of historical fact which underlie the

16

state court's conclusion on this question" are, in fact, entitled to the statutory presumption.  Alvarez v. Keane, 92 F. Supp. 2d 137, 152 (E.D.N.Y. 2000); see also Boles v. Senkowski, 878 F. Supp. 415, 420 n.2 (S.D.N.Y. 1995).

B.   Application to Facts

The Appellate Division affirmed the decision of the hearing court and concluded that "the lineup participants were sufficiently similar in appearance so that defendant was not singled out for identification."  Nightingale, 1 A.D.3d at 179, 766 N.Y.S.2d at 847.  Petitioner has not rebutted the correctness of the court's factual finding with clear and convincing evidence, or shown that its implicit legal conclusion — that the lineup was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification — was an unreasonable application of clearly established Supreme Court law.

The photographs of the lineup do not demonstrate that physical differences between Petitioner and the fillers were so obvious that the selection of Petitioner was foreordained.  (See Ex. A to Declaration of Paul M. Tarr, Esq. in Opposition to Petition for a Writ of Habeas Corpus, dated Dec. 1, 2008 ("Tarr Decl.").)  The members of the lineup were all seated, and thus there were no significant observable differences in their heights.  They were also holding number placards in front of their abdomens, which, to some extent, served to conceal their weight differences.  Despite

17

their actual weight differences, the photographs of the lineup do not show Petitioner to be so much larger than all other members of the lineup. For example, the filler in Position 3 does not appear to be substantially slimmer than Petitioner. Moreover, the men's skin tones were varied, with some of the fillers having a skin tone similar to Petitioner's.[2]  Overall, the faces of the members of the lineup were quite similar, with none standing out.

Viewing the totality of the circumstances, the Court cannot conclude that the state court's determination that the lineup was not unduly suggestive was an unreasonable application of clear Supreme Court law.  In any event, even if the lineup was unduly suggestive, applying the factors set forth in Biggers, there clearly was an independent source for the witnesses' identifications of Petitioner, thus rendering them reliable.

Petitioner spent twenty to thirty minutes in the furniture store, giving each of the victims ample opportunity to observe him. (See Tr. at 169.)  When he robbed Bonstrom, he stood two to three feet in front of her, and she had a clear view of his body and facial features, particularly his face, eyes and haircut. (See id.

---

[2] Petitioner's contention that he was the only person in the lineup without facial hair is of no moment, as none of the witnesses noted that he did or did not have facial hair, when they described their assailant to the police. Moreover, the other men in the lineup had fairly minimal facial hair; none had a full beard.  In addition, other than stating that their assailant was black, the witnesses did not describe his skin tone.

18

at 113-117.)   Peguero and Gavin watched Petitioner during the robbery, and Gavin observed Petitioner's face throughout the robberies.   Peguero was able to observe Petitioner closely throughout the time he was in the store. (See id. at 56-57, 91, 167-70, 179.)

In addition, the description of Petitioner that the witnesses provided to the police — a black man, approximately thirty years old, who weighed 250 pounds and was either six feet or six feet, four inches tall, was consistent with Petitioner's actual physical characteristics.   Further, when initially shown over two hundred photos, the witnesses did not misidentify any of the men as their assailant.   Gavin immediately identified Petitioner with certainty in a later photo array, and Gavin and Peguero quickly identified Petitioner in the lineup.   Finally, at trial, Gavin, Peguero, and Bonstrom each identified Petitioner as their assailant, and testified that they were "sure" or "positive" about their identifications. (See id. at 58, 110-11, 157.)

In sum, the witnesses' identifications of Petitioner were independently reliable and did not raise "a substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. at 106-07, 97 S. Ct. at 2249.   The Court therefore recommends that Petitioner's lineup claim be dismissed.

III. Evidence of Petitioner's Prior Convictions

The trial court allowed the prosecutor to cross-examine

19

Petitioner about his prior attempted second-degree assault, petit larceny, and second-degree robbery convictions. The prosecutor was also permitted to elicit the underlying fact that the assault conviction involved a knife. Petitioner asserts that his right to due process was violated when the trial court allowed such cross-examination, because it did not reflect on his credibility and merely served to suggest that Petitioner was a dangerous person who had used a knife in a prior crime, as he was alleged to have done in the robberies in issue. (See Pet.'s App. Br. at 19-24.)

A. Applicable Law

Federal habeas courts are reluctant to overturn state court evidentiary rulings. See Crane v. Kentucky, 476 U.S. 683, 689-90, 106 S. Ct. 2142, 2146 (1986) ("[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.") (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431 (1986)).  It is well established that a federal court is limited on habeas review to a determination of whether a challenged trial court ruling involves an error of constitutional magnitude.  See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("'[F]ederal habeas corpus relief does not lie for errors of state law.'") (quoting Lewis v. Jeffers, 497 U.S. 764, 779, 110 S. Ct. 3092, 3102, reh'q denied, 497 U.S. 1050, 111 S. Ct.

14 (1990)). Accordingly, even erroneous evidentiary rulings do not automatically rise to the level of a constitutional violation susceptible to habeas relief. See Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1987); see also Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y. 1995) ("In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue."). Rather, a petitioner seeking habeas relief based on an allegedly erroneous evidentiary ruling must establish that the trial court's error deprived him of a constitutionally recognized right, such as the right to a fundamentally fair trial. See Rosario, 839 F.2d at 924-25; Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). Habeas relief can be granted only if improperly admitted evidence is so unfair that it violates fundamental concepts of justice. See, e.g., Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990). To reach this high threshold, the erroneous evidence must have provided the basis for conviction, or else the evidence must be so integral that without it, reasonable doubt would have existed. See Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998); Rosario v. Ercole, No. 05 Civ. 8072 (PKC), 2008 WL 4684161, *13 (S.D.N.Y. Oct. 22, 2008). Even if a constitutional violation is established, habeas relief is warranted only where the petitioner demonstrates that the evidentiary error had a "'substantial and injurious effect or influence in determining the jury's verdict,'" Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113

21

S. Ct. 1710, 1722 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S. Ct. 1239 (1946)); <u>see also</u> <u>Coleman v. Squilliante</u>, No. 06 Civ. 13518 (JSR), 2008 WL 4452351, at *9 (S.D.N.Y. Oct. 2, 2008) (citing <u>Brecht</u> for the "substantial and injurious" standard); <u>Butler v. Graham</u>, No. 07 Civ. 6586 (JSR), 2008 WL 2388740, at *6 (S.D.N.Y. June 12, 2008) (same).

Under New York law, "a trial court is permitted wide latitude in ruling on the scope of cross-examination and its ruling is not to be disturbed on appeal absent abuse of discretion." <u>Bush v. Portuondo</u>, No. 02-CV-2883 (JBW), 03-MISC-0066 (JBW), 2003 WL 23185751, at *14 (E.D.N.Y. Oct. 29, 2003) (citing <u>People v. Schwartzman</u>, 24 N.Y.2d 241, 244, 299 N.Y.S.2d 817 (1969); <u>see also</u> <u>People v. Sorge</u>, 301 N.Y. 198, 201-02, 93 N.E.2d 637 (1950). Specifically, trial courts are vested with discretion in balancing whether "[e]vidence of prior specific criminal, vicious or immoral conduct should be admitted if the nature of such conduct or the circumstances in which it occurred bear logically and reasonably on the issue of credibility," or whether the prejudicial effect of such evidence would have a disproportionate, improper impact on the jury's determination of guilt or innocence of the specific crimes of which the defendant is charged. <u>Sandoval</u>, 34 N.Y.2d at 376-77, 357 N.Y.S.2d at 855. Violent or vicious conduct can be probative on the issue of credibility since "willingness or disposition on the part of the particular defendant voluntarily to place the

advancement of his individual self-interest ahead of principle or of the interests of society . . . may be relevant to suggest his readiness to do so again on the witness stand." Id. at 377, 357 N.Y.S.2d at 855. Nevertheless, "cross-examination with respect to crimes or conduct similar to that of which the defendant is presently charged may be highly prejudicial, in view of the risk, despite the most clear and forceful limiting instructions to the contrary, that the evidence will be taken as some proof of the commission of the crime charged rather than be reserved solely to the issue of credibility." Id. at 377, 357 N.Y.S.2d at 856. In the end, a state court's balancing of prejudice versus probative value, in determining whether to admit evidence of prior convictions, "will rarely reach constitutional dimension." Butler, 2008 WL 2388740, at *6.

B. Application to the Court's Sandoval Ruling

The record indicates that the trial court reasonably exercised its discretion in conducting the traditional balancing that is required in determining what cross-examination about prior convictions would be permitted. (See Sand. at 19-24.)  The court permitted inquiry into four out of nine prior convictions.  Two of the convictions were theft-related, and one involved the use of a knife — both matters that were in issue in the robberies being tried — thus, presenting the possibility of prejudicing the jury. However, those matters were also relevant to Petitioner's

23

credibility. While, as Petitioner contends, any potential prejudice could have been reduced by precluding examination about the facts of the offenses (that is, an attempted robbery and use of a knife), by merely asking about whether there was a felony conviction, there is no such requirement under New York law. Nor is there a requirement that cross-examination about convictions similar to the crimes in issue be precluded.[3] See People v. Hayes, 97 N.Y.2d 203, 208, 738 N.Y.S.2d 663, 666 (2002) ("Repeatedly we have eschewed fixed rules to determine where to draw the line. We have, for example, declined to prohibit impeachment simply because of the potentially inflammatory impact of the prior crime or the victim involved. . . . And we have declined to prohibit cross-examination solely because of the similarity of prior acts to the crime charged.") (internal citations omitted); accord People v. Brightley, 56 A.D.3d 314, 315, 867 N.Y.S.2d 90, 91 (1st Dep't 2008) ("The fact that the [prior] incident had certain similarities to the charged crime did not require preclusion of inquiry.") (internal citations omitted).

The Appellate Division held that the "court's *Sandoval* ruling

---

[3] The trial court did give a limiting instruction to the jury, warning them that evidence of prior convictions is not evidence of guilt and is to be used only to assess the defendant's credibility. (See Tr. 342-43, 389-90.) Jurors are presumed to follow instructions, see Zafiro v. United States, 506 U.S. 534, 540, 113 S. Ct. 933, 939 (1993), including limiting instructions. See United States v. Stewart, 433 F.3d 273, 307 (2d Cir. 2006).

24

balanced the appropriate factors and was a proper exercise of discretion.   We note that the court precluded inquiry into the majority of defendant's numerous convictions."   Nightingale, 1 A.D.3d at 179, N.Y.S.2d at 847 (internal citations omitted).   The state court's determination was neither contrary to, nor an unreasonable application of, clearly established federal law.   The permitted scope of cross-examination was neither so unfair that it violated fundamental concepts of justice, nor so integral that, without it, reasonable doubt would have existed. See Dunnigan, 137 F.3d at 125.   The evidence of Petitioner's guilt was extremely strong.   There were three eyewitnesses who were in Petitioner's presence for close to one-half hour, and who unequivocally identified him as the person who robbed them and the furniture store. Moreover, there was evidence of Petitioner's telephone calls from the cellphone that he had stolen.   There is no basis to conclude that allowing cross-examination about Petitioner's prior convictions had any significant impact on the jury's verdict, or served to dissipate the possibility of reasonable doubt in the jurors' minds.

Accordingly, Petitioner's Sandoval claim relating to the evidence of his prior convictions should be dismissed. See Peterson v. Greene, Nos. 06 Civ. 41(GEL), 06 Civ. 811(GEL), 2008 WL 2464273, at *5 (S.D.N.Y. June 18, 2008) ("No doubt different judges might strike the balance differently with respect to the precise extent

25

of cross-examination that would be permitted, with some allowing more and some less than was permitted in this case. Perhaps some would exclude the examination altogether, because of the age of the convictions or for some other reason.    Nonetheless, the trial court's ruling was well within the range of reasonable decisions, and in no way rendered Peterson's trial fundamentally unfair.").

III. <u>Excessive Sentence</u>

Petitioner contends that his sentence of twenty years' imprisonment was excessive and should be reduced in the interests of justice. (<u>See</u> Pet.'s App. Br. at 25-27.)    The claim is not cognizable in this federal habeas proceeding because it does not present a federal constitutional question.

There is no constitutional issue that arises where the sentence imposed by a state court falls within the range prescribed by state law.    <u>See</u> <u>Dorsey v. Irvin</u>, 56 F.3d 425, 427 (2d Cir. 1995); <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) ("[N]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); <u>Edwards v. Marshall</u>, No. 07 Civ. 9262 (VM), -- F. Supp. 2d. --, 2008 WL 5050149, at *11 (S.D.N.Y. Nov. 26, 2008); <u>Mercer v. Keane</u>, No. 95 Civ. 1538 (JFK), 1997 WL 529031, at *5 (S.D.N.Y. Aug. 25, 1997); <u>Thomas v. Senkowksi</u>, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) <u>Alvarez v. Scully</u>, No. 91 Civ. 6651 (PKL), 1993 WL 15455, at *12 (S.D.N.Y. Jan. 11, 1993), <u>aff'd</u>, 23 F.3d 397 (2d Cir. 1994); <u>Underwood v. Kelly</u>, 692 F. Supp. 146,

26

152 (E.D.N.Y. 1988), aff'd, 875 F.2d 857 (2d Cir. 1989).

Petitioner concedes that the sentence he received was within the authorized statutory range and below the maximum permissible sentence. (See Pet.'s App. Br. at 26 ("[T]he trial court imposed a sentence that was two times as long as the minimum and only five years less than the maximum.").) Thus, he does not claim a violation of either state law or federal constitutional law. Indeed, there was nothing in his argument of the issue to the Appellate Division that even suggested that a federal constitutional issue was at stake. And he certainly makes no such claim in this proceeding. Rather, in his appellate brief, he appealed to the court's sentencing discretion, a consideration this Court cannot exercise in a federal habeas review of a state court conviction.[4]

Accordingly, Petitioner's sentencing claim should be dismissed.

## CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the Petition be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir.), cert. denied, 531 U.S. 873, 121 S. Ct. 175 (2000). The Court further

---

[4] The Appellate Division "perceive[d] no basis for reducing the sentence." Nightingale, 1 A.D.3d at 180, N.Y.S.2d at 847.

27

recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct. 917 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 145, 106 S. Ct. 466, 470 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: January 7, 2008
New York, New York

28

Copies mailed to:

Le'Run Nightingale
#01-A-6280
Five Points Correctional Facility
State Rte. 96
PO Box 119
Romulus, NY 14541

Paul M. Tarr, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271